I'm here on behalf of Alaska Wilderness League and the other appellants. I'd like to reserve five minutes for rebuttal, please. When it issued the take rule here, the government concluded that oil exploration in the Hanna-Shoal greater than negligible impact, absent the imposition of additional mitigation measures. Could you address mootness first? We're required to take it up and I'm pretty concerned about it because it looks like only one oil company has shown any interest here and they've said they don't have any more interest because of the price of oil and the uncertainty of government regulation and they've pulled out. So it looks like we don't need to do anything in order to assure the safety from incidental take of the Hanna-Shoal's walrus and neither does anyone else because there's nobody there with the walrus anymore. Well, Your Honor, the regulation remains in place until 2018 and other companies can operate under that regulation. They have to get a letter of authorization to operate and no other company has proposed to do that and the reasons that Shell gave for pulling out would seem applicable to anyone else. I don't think anyone's even suggested or participated in an auction, have they? There hasn't been a lease sale, that's right, but we don't know whether other companies will or will not and even Shell has said that although it's not going to drill in 2016, it's left the door open for future activities. Does Shell still have, I mean, is the LOA that Shell has issued still operable? Is it totally within Shell to decide, I mean, if the mill is exploded tomorrow, would Shell want to go drill up in the Arctic? The letter of authorization expired November 1st as is customary. Is it only good for one year or for a certain period of time? For a certain period of time, the LOAs are. So at this point, they don't have a letter of authorization and could not proceed with that one. That's correct. There's no public process for the letters of authorization, so we wouldn't necessarily know when one was applied for, when one was issued. Are they subject to a judicial action, to an APA action? They are. However, they usually issue days before the activity begins and they are for limited duration and this court in CBDB Chemthorne recognized that problem and said it's fine to challenge, it's right to challenge the five-year rule. You don't have to challenge the letter of authorization. So the threat remains, notwithstanding Shell's announcement, and this court can still grant meaningful relief. In a way, your challenge to the rule is just like Shell's reason for pulling out. You challenge the rule because you say you don't know quite what the arrangement is until the letter of authorization comes out and Shell says we're pulling out. We're not going to drill for oil here, partly because of the price of oil and partly because the letter of authorization process makes government regulation too uncertain for us to plan whether it will be worth our money. We challenge the rule because the government has conceded that there might be negligible impact in the Hanna-Scholl area, but it has covered that area in the rule and it has not identified or imposed the additional measures that it itself says may be required to keep effects below negligible. Can we, under Supreme Court precedent, do anything in a case? Can we act on a case where there will only be a genuine case or controversy if the price of oil goes up enough so that possibly some oil company will ask for a letter of authorization and possibly the letter of authorization will issue in a process not open to the public and possibly it won't satisfactorily protect the walrus? It seems like it's speculation piled on speculation. I don't know if we have the authority under standing law and mootness law to do anything. This issue is decided in CBD v. Kempthorne in which the court held that the plaintiffs do have standing to challenge a rule as long as letters of authorization have been issued, which they have been here, and there's a threat of their issuing again in the future. Maybe it's standing, but the ultimate question here, it's not a standing. I don't see it as a standing issue. It's a mootness kind of issue. So are you arguing explicitly that this comes within the exception to mootness or the rule that a party cannot moot a case by taking action itself so that Shell could not moot this case by saying we're not going to drill, because then the case gets dismissed, but then they can go through the process, you wouldn't even know about it, and could come back and start drilling again? The case is not moot under this court's precedent in Washington v. Daly and the cases that we cited in our letter brief because the framework regulation remains in place and as a result the effective relief can still be granted by removing that and removing the threat. I didn't understand your answer to Judge Wardlaw's question. Are you saying the voluntary cessation doctrine does apply or does not apply? We think that there doesn't need to be an exception to mootness because the case is not moot. Do you know what I mean about the voluntary cessation doctrine and what Judge Wardlaw means by it? I do and I think that that's a secondary basis upon which I think... But Shell's not even a party to the case. That's right, but it's not voluntary cessation. I think it's the capable of repetition but evading review. Why would it evade review? These things go on forever. We have years of environmental litigation before anyone can do anything. It's one of the reasons Shell says it's getting out is because of the uncertainty of the regulatory process. Why would it evade review? We're reviewing right now or would be for sure if Shell hadn't said we're pulling out. Well, because if we had to wait until a law had been issued, one would have three months to litigate the case because... You'd have three months to file. Let's say, I don't know if it would be three months or not, but you'd have a period of months in which to file for a preliminary injunction and they have been very liberally granted in this area. But the short duration, I believe this court's precedent, and I don't have it, I can do it on rebuttal, says that even two years is enough to say that it's capable of repetition but evading review. There are some cases where you have to get it done and you can't get litigation like this done in a few months, but you can get a preliminary injunction very quickly and typically the environmental interests have on these oil drilling projects. Except in this very case, the district court denied the temporary injunctive relief and our court affirmed that. That's right, Your Honor. I'm not sure that the availability of preliminary injunctive relief is... Well, it seems like that occurrence in this case actually harms your capable of repetition yet evading review argument because, in fact, the preliminary injunction was ruled upon in district court and ruled upon in the appellate court. So, it did not evade review. The... Your Honor, I think we... I think this court's precedent does support the idea that because the time for getting effective relief for the activities is so short, the activities will be over by the time... You could get a preliminary injunction, perhaps, but the activities have a very short open water period and they'd be over as they were here in November. And then the case would potentially be moved. Well, they must get their letters of authorization while the ice is still in because if they got a letter of authorization after the ice had gone out, they couldn't act on it that season. When did they get their... Well, back when Shell got its letter, it wasn't issued in June when you start getting some opening of the ice. It was. I'm not exactly sure of the exact date, but it was issued right before activities started, so it was issued very close to the time when... I think this issue is interesting, but I'd like to hear some of your arguments on where the district court went wrong. Right, well, so this is... On the merits. My understanding is the challenge here is only the regulations, sort of as applied to the Hanna-Scholl area. Is that right? Well, the Hanna-Scholl area is the key feeding area for walruses and it was a central issue that the agency grappled with in the records here. The regulation or the notice, all the discussion that precedes the regulation is quite substantial. This doesn't deal with Hanna-Scholl. That's true, but the problem is that the agency singled out the Hanna-Scholl as the area which would require additional mitigation and in which it could not conclude that effectively... What is it that you're asking for them to do? Because they do list some things that they might do on a given activity. They... What should the regulation have said according to your understanding of the statute? If, as here, they couldn't conclude that impacts would be negligible there, the regulation couldn't cover the area or the travel corridors to and from the area and so it shouldn't have been covered. So there shouldn't have been a blanket... Except around Hanna-Scholl, a certain area, that's off the table for any activity. That's right because the court was required... I mean, the agency is required to ensure that... to make a finding that the take covered by the rule will have only a negligible impact. They couldn't make it for the Hanna-Scholl and travel corridors to and from, so therefore they couldn't issue a rule covering that area. There is another process, incidental harassment authorization. I'm not sure that that is quite a fair representation of what the agency did. I thought what they did was they had a rule and they said there will be... They made a finding of no significant impact. The agency recognized that Hanna-Scholl was more sensitive for walruses than other areas covered by the rule, so they said that the finding of no significant impact is contingent on our authorizing from time to time activities subject to additional restrictions and their letter of authorization imposed additional restrictions to make sure there would be no take of walruses. By take, what they meant was worrying or annoying the walruses with noise, not killing walruses because that didn't even come up. And then they issued the letter assuring that there would be no take in that very limited sense. I don't understand what's arbitrary and capricious about that. The MMBA requires an upfront finding and doesn't allow the agency to issue... So what you're saying is the rule would have been fine if it had incorporated the terms of the letter of authorization, and what's not fine is having a rule that's subject to subsequent further restrictions on activities. The rule would have been fine if the agency could have identified up front those mitigation measures that it relied on. Why did they have to do that? It seems less arbitrary to do it the way they did it because the animals... Well, we don't see walruses where I live, but we certainly see moose, and where the moose proliferate one year can be a few hundred yards away or a couple of miles away from where they proliferated last year. Same with caribou. It can be 30 miles from where there were a lot of caribou last year. So why wouldn't it be more rather than less arbitrary for the agency to do as you suggest and impose all the restrictions before they know just what the walrus situation is at that particular time? To answer that in the arbitrary and capricious frame, they don't have a basis for their negligible impact finding. Yes, they made an overall negligible impact finding, but they conceded that they don't know whether that's true or not for the Hannah Shoal. They say in the records at 46, excuse me, records at 46, sorry, at 84, for example, we will consider whether additional mitigation and monitoring measures could reduce any potential impact to meet the small numbers and negligible impact. I don't think I made my question to you clear. Let me try to clear it up. There's a highway called the Top of the World Highway. You can drive it for 10 years and never see a caribou, and then the 11th year you can see great herds of caribou. What is arbitrary and capricious about a procedure that says what we allow in terms of driving this highway will depend on additional restrictions we may impose at the time so that if there's a herd of caribou there, we're going to limit driving? I agree with you. There will always be uncertainty, but that's here. There was certainty that there was a problem that the agency identified, and that is that there will be, walruses can reliably be predicted, that's the agency's word, to be in the Hannah Shoal in the open water. Given that problem, which was central to the agency's analysis here, it couldn't find, it couldn't ensure that activities would have a negligible impact there. Absent the imposition of additional mitigation measures, it didn't know what mitigation measures it would impose. It didn't know whether they would even meet the standard, and it deferred that to a later non-public process when the statute says... People, you're not saying to Judge Kleinfeld, the agency actually expressed certainty, unlike the caribou situation. The agency actually expressed in all of that little small print that was produced, they actually expressed certainty that the walruses would be there. That's right. The problem was not uncertain. The solution was uncertain, and you can't leave the solution uncertain and promulgate a rule that covers the area. Just a little twist on what Judge Kleinfeld had to say, but in the regulation itself, when it's talking about, towards the end, section 118.118, it's talking about the Hannah Shoal walrus use area, and it says, due to the large number of walruses that could be encountered in the Hannah Shoal walrus use area from July through September, additional mitigation measures may be applied to activities within the HSWUA on a case-by-case basis, and this is your whole point. But they go on to say, these mitigation measures include, but may not be limited to, seasonal restrictions, reduced vessel traffic, or rerouting of vessels. To the maximum extent practicable, aircraft supporting exploration activities shall avoid operating below 1,500 feet ASL. So why aren't they identifying certain measures that may well apply in the Hannah Shoal area? Why isn't that sufficient to show that even though they're not saying, putting specific area limitations within this regulation, why isn't what they've said here sufficient? One, because the agency has said it's not sure if those will be enough. Two, because there's no standards or criteria attached to that. We've got seasonal restrictions, for example. So when, what will be restricted? What sorts of restrictions will there be? There's nothing to comment on. There's nothing to evaluate for the public to comment on or to evaluate whether these will work. So that's why, one, they might not work, so the agency wasn't sure if it would work for negligible impact. And two, these aren't sort of means of reducing impact to least practicable because they don't contain any of these criteria that you need to assess their efficacy or their... So like rerouting of vessels, I mean, I guess there's a way to reroute vessels around the Hannah Shoal area, correct? There may be. We don't know and we don't have any of the details. I thought they had a rule that in the letter of authorization they have to stay at least a mile away from any walrus, something like that? Well, that's right. The letter of authorization had excluded vessels from going into the Hannah Shoal area or part of the Hannah Shoal area. It varies by season, 50% occupancy. But that's in the letter of authorization and not, which isn't subject to public comment, which isn't done up front. And, again, the agency deferred the... So your issue is not really the absence of any justification for a finding of no significant impact on the walruses. Your beef is that your organization, for example, did not get to participate in the letter of authorization process. No, Your Honor. There's no basis for the finding in NEPA, if we're talking about finding no significant impact. There's no basis for that finding. The court's precedent said that if you do a finding of no significant impact and it relies on mitigation measures, those have to be evaluated and set out in the EA so that the court can analyze whether they are sufficient. Well, the reg already does say that the approaches must minimize interactions with walruses. Right. The regulation says that. It's a federal crime to worry a walrus. That's true. The general measures in the regulation, the agency itself said, may not suffice for the Hanna-Scholl walrus use area. It relied on special additional mitigation measures, which are nowhere identified or imposed in the regulation and thus aren't analyzed either in the EA. What's the relief you're asking for? We would like the rule vacated. The entire rule? Because the error is central to the agency's ability to Could it just be vacated to the Hanna-Scholl area? Well, the travel corridors to and from are also an area that the agency identified as requiring additional mitigation measures, and it didn't define those. How about just a preliminary injunction, an injunction that just prohibits them from applying these rules to the Hanna-Scholl area? That's one of the reliefs you can get under the EA. That's true. I think the normal course for unlawful action is vacature of the rule, and there's no It's an equitable remedy, though. It's true. A vacate is equitable because sometimes we don't vacate. That's true, Your Honor. The reasons not to vacate aren't present here because it would preserve Well, it's a very large area, right? We're dealing with an extent The Hanna-Scholl area is just within the whole area that's covered by this red, right? That's true, Your Honor. The Hanna-Scholl area is within it, and it's right centrally located where most of the leases are around in that area, but the agency's It's the most important feeding ground, and the agency's ability to make the statutorily required conclusions rested on how it's going to deal with the problem. So is the company seeking to do their exploratory drilling right next to the Hanna-Scholl area? Shell did, yes. Shell's was You said did, and Judge Faiz put it in the present tense. Is anyone trying to drill anything for oil or anything else in or near Hanna-Scholl? We don't know. We don't have any information that they are. No, we have no information that they are, but we don't know. This current summer when they were drilling out there, were they drilling right up there by Hanna-Scholl? They were. They were about eight miles from what the core area defined by the agency in the travel corridors, and so they were right there, and they were Were right there. You mean they were eight miles away? That's right. They were eight, and the LOA precluded them from entering portions of that core area. Hold on. I'm trying to find the fact here. You said at one point they were right there at Hanna-Scholl, and at another point you said they were eight miles away from Hanna-Scholl where they were drilling, and I'm trying to find out which it is. Okay. I'm sorry. My mistake. The drilling site was about eight miles away. There are a lot of associated vessels that go with drilling, like icebreakers, and those actually cause some of the bigger disturbance to walruses, and those range as far as 20 miles from the actual drill site. When you were answering Judge Pius's questions about partial vacatur, you said, well, it also would have to extend to the travel corridors. Do you mean the travel corridors of the walruses or the travel corridors of the drillers? The travel corridors of the walruses, and I'll point you in the records at Excerpts of Records 69, 173, 156, and 155, and where the agency expresses concern about effects to walruses in the travel corridor. And routes to either eating grounds or resting grounds. That's right, because walruses now in the open water are swimming hundreds of miles round trip from their coastal haul-outs to the Hanna-Scholl to feed, and those are the areas of concern. But I don't understand your answers to Judge Pius's. The remedy can be an equitable one, and why couldn't we just limit it to the Hanna-Scholl area? Again, because- And the walrus travel areas, travel corridors, or something like that. Because I think when the ability of the agency to analyze that area is essential to disability- You're saying that this flaw, which, I mean, I understood, and maybe I'm wrong,  but I understood the flaw is that the explicit language of the MTA states, you must make this finding, and you must set forth these things. And what the agency did is it purported to make a finding, and then it contradicted its findings, so we don't know what the finding is. And then it did not set forth right in the regulation the mitigation that would be required so that they could actually make an honest finding about the total take. That's the argument, right? Yes, Your Honor. So the answer to that, your answer to that is you have to strike the whole regulation because this defect makes the whole regulation defective or invalidates the whole regulation. Because they have to make this upfront finding of total take for all of the activities under the rule. And so we think that vacating the rule so that they can reassess that total take is the appropriate remedy. All right, well, you're seven and a half minutes over, and I think we should hear from other people. Thank you, Your Honor. Thank you very much. If the Court will indulge us a couple minutes for rebuttal. Okay, let's see what others have to say, and then we'll- Okay, thank you very much. Thank you. Good morning, Your Honors. May it please the Court, my name is Tecla Hanson-Young, and I represent the Fish and Wildlife Service. With me at counsel's table is Ryan Steen, who represents the interveners. I hope to save five minutes of my time for him if you have questions for him. I think the most important thing for the Court to keep in mind are the kinds of impacts that we're talking about in the Hanischel area, and to really understand what kinds of mitigation measures the service imposed throughout the regulation. Could you comment on mootness? Sure. We can't avoid it? Sure. The government did not make a mootness argument. I know that. I think the government and the oil companies both oppose dismissal of the appeal on grounds of mootness. They both claim that it's not moot, and I did not fully understand the agency's position. I understand they both want to preserve the district court decision that says that the regulatory procedure was okay, but beyond that, I'm a little foggy. As the complaint is written, it challenges the regulations, which the Court has found to be a permissible kind of challenge, although typically these regulations don't actually authorize any activity. So no activity is actually authorized until an individual letter of authorization is issued, so it's a bit unusual in that context. But under this Court's case law, challenges to these kinds of regulations are permitted. The government has made that argument in the past. It has lost that argument on mootness. And I think the point about Shell pulling out and the lease sale being canceled for lack of interest goes to show that impacts, if anything, will be less than what was expected in the regulations, because fewer people will be out there. Okay. That's way beyond the realm. I'm not sure. Sure. I mean, we can't consider that. Sure. I think that is – so the fact that Shell has pulled out doesn't, in the government's view, moot the case. It's kind of like a regulation of a product that is no longer made, the last company making it quit making it, and nobody proposes to make any again. Sure. I think that's a fair view. If the Court would like the government to submit additional briefing on mootness, we will be happy to do so. Do you have any more to say about it today? No, we don't. Other than that, we don't believe the case is moot. So is this a facial challenge or an as-applied challenge to the regulation? It's a facial challenge. That leans toward not being moot. That's correct. That's your point. Right. That's right. Because the way that the complaint was written challenged the general regulations as being inadequate under the statute. Okay. And you don't challenge their standings, though. No, we do not challenge their standings. That's correct. All right. Let's get to the merits. Okay. One, the Hanischel area is a core area that Walrus is used, but one thing that is discussed in the regulations is the fact that the Hanischel Walrus use area is a broader area and that at any given time in any month, the portion of the Hanischel Walrus use area that is occupied and used by Walruses changes because the ice recedes and so more of it becomes available later in the year. So they typically move. The nature of the impacts in the Hanischel Walrus use area were expected to be limited primarily to vessels transiting through the area. The service did not expect to authorize things like exploratory drilling or seismic surveys in the area, first of all, because most of the blocks are not leased. There are not that many there, and most of them are not currently leased, so there would be no interest. So how would we know that other than, based on this regulation, other than when it comes time to issuing a letter of authorization? Well, the permit, the petition for the regulation, lists the kinds of activities that the petitioner expects to occur within the proposed area. So throughout the Chukchi Sea, there were certain kinds of activities that would be proposed to occur, and the Alaska Oil and Gas Association explained, for example, that they wouldn't be asking for activities to occur along coastlines, where there's likely to be Walrus haul-outs, things like that. And the other way that the court can determine that the types of activities are going to be limited in the Hanischel Walrus use area is by looking at the regulations, which explain what kind of activities would occur there, particularly at ER 79 and 84 and page 74. Because the kinds of activities that would be occurring in the Hanischel Walrus use area would be limited to vessels moving through, the service therefore reasonably expected that its general mitigation measures, general and extensive detailed mitigation measures that it required for all letters of authorizations in the regulations, would be sufficient to protect walruses. And there's two main ways that the service ensured walruses would be protected, not just in the Chukchi Sea, not just throughout the Chukchi Sea, but that also includes the Hanischel Walrus use area. And the primary way that the service ensures walruses are protected is by keeping vessels and aircraft separate from walruses, both temporally and spatially. So there's a restriction on vessels and aircraft in the area before July 1st. And that restriction allows walruses to finish their migration to get to the areas that are important for them. And where's that instruction requirement? In the regulations? In the regulations. That one is on, well, so it's discussed fully in the environmental assessment at SCR 283. And the time... Is it embedded? It is. I pointed out in the regulations. Sure. The actual regulations. It's on page ER 97. And the regulation is 118? 118, 118, 18.118. And it is sub-point four. Sub-point four. Sorry, sub-point, it's 18.118A. It's very difficult to follow, but... Yes, that's correct. Every LOA has to contain all of the mitigation measures on page ER 97 and ER 98. All of them. Could you tell us, I'm not clear on the LOA procedure. Suppose an oil company decides to drill. They file an application or a petition for a letter of authorization? That's correct. And what I'm unclear on is, do other people get to see it? When do they file it? How fast is it acted upon? What are the... How does it work? What's the process? Sure. Once the incidental tape regulations are issued for the five-year period, individual operators apply to the Fish and Wildlife Service for an individual letter of authorization. Those applications would typically come in any time between November and December of the preceding year, up until about 90 days before they expect activity to start. And are they public? They are not public. It's not a public process. But they are judicially reviewable, and the service has also indicated in the final regulations that it is willing to accept comments from the public at any time about new mitigation measures. It will reevaluate mitigation measures if the public submits information to it that is worthwhile considering. And the service has reported to me that it has received no such comments since it has issued these regulations about additional mitigation measures that it should require. I would also point out that the plaintiffs here haven't challenged any of the specific mitigation measures as being insufficient to ensure walruses and vessels and aircraft are separate. And some other examples of mitigation measures that are required, that are mandatory throughout all letters of authorization are, for example, when walruses are on ice, vessels have to stay as far away as possible and cannot get any closer than half a mile. And the reason for this, as discussed in the regulations, I thought it was one mile. One mile on land, half a mile when walruses are on ice. I'm sorry? Half a mile when walruses are on ice and one mile when walruses are on land. And the reason for the distinction is because when walruses are on land, they are more vulnerable to disturbance than when walruses are on ice. And the service in the regulations discussed the reason why it required the separation restriction. Well, first let me give you a couple of other mitigation measures that the service required. The service also required that when vessels approach groups of 12 or more walruses in the water, vessels have to slow down. They have to avoid harassing walruses. They have to also stay more than half a mile away from them. And they cannot operate to separate any of the walruses within that group. And the reason for that, previous monitoring, and also all vessels have to have marine mammal observers on board to monitor for walruses on ice, on land, in water. Those are government observers, not company observers? I think there are both, actually. There are observers who are paid for by the company, and there may also be government observers. But as a matter of course, there must always be observers. I thought under the Marine Mammal Protection Act, there were people that were hired by the U.N. or somebody that were always on the boats. I'm not sure if the U.N. may hire them, but there are separate government marine mammal observers under the Marine Mammal Protection Act, which may be placed on boats. That is a measure that was identified as a possible measure. But as a matter of course, in addition to that possibility, all vessels must have trained marine mammal observers on board. I'd like to discuss with you the language of the MMPA itself. So Section 5A1 says, you know, there's a petition. Okay, so that can't be the LOA process, right? That's correct. Okay, so after notice and public comment, the secretary can only allow a specified activity if the secretary, and it says, finds that the total of such taking during each five-year or less period concerned will have a negligible impact on such species and will not have an unmitigable adverse impact on the availability of such species or stock for taking subsistence. Now, this plain language makes it appears to me that the secretary has to have public notice and comment and then make this finding. I don't see any ambiguity. And what I just don't understand is how you can make a finding of negligible impact or negligible taking if you are going to decide later, as you say in your regulation, on a case-by-case basis, what mitigation will be good or won't be good or what will work. There's so much uncertainty in all of this. I don't know how you can comply with the MPA and say there will be a negligible taking if we allow shell to drill. You don't even know, or the secretary doesn't even know when she's making this representation what obstacles are going to arise. Respectfully, Your Honor, the Fish and Wildlife Service did make the negligible impact finding in the regulations based on its understanding that all of the general mitigation measures that are required in the regulations would be sufficient to keep vessels and aircraft and walruses separate. And the fact that it retained the additional authority to impose certain kinds of mitigation measures, for example, seasonal restrictions, rerouting of vessels, is only a more protective measure that will ensure further separation of walruses and minimize which- I think I understand what you're saying now. I think what you're saying is kind of a fence around the law, that you can make a finding of no significant impact because you've already got a reg that says vehicles should reduce speed, maintain a minimum distance, no aircraft at an altitude lower than 1,500 feet and so forth. And those rules alone are sufficient to assure no significant impact on the walruses. But just because we care about walruses a lot, we're going to go beyond what's necessary to assure no significant impact on the walruses in our letters of authorization. Is that what you're saying? Do I understand it? That is one component of what the government did. And the other component is that it retains the authority to impose additional measures, for example, rerouting vessels, to respond to real-time information. So monitoring- I guess my question is more does the MMPA allow the Secretary of the Interior to do that? So the MMPA is silent on- I mean, it's kind of unambiguous on its side. I don't know if it's silent. I kind of agree with you that the second prong, you know, the permissible methods, the other parts, you know, leaving it for later, you can add measures. I understand that part on the second prong of the statute. But on the first prong of the statute- Well, the government agrees that the finding needs to be made in the regulation. I think maybe where there's some- what you are sort of expressing concern over is the fact that there is a two-step process that the service created in implementing regulations. Right, and the second step of the process does not come after public notice and comment. That's correct. And that's the problem because the finding can only be made after public notice and comment, according to the statute and the language that Congress used. Right. So my first response to that is that when the government issues letters of authorization, it only issues them if it signs when it gets that site-specific permit and looks at what the proposed activities are. It will only issue that letter of authorization if it is consistent with the regulatory findings. There's a lot of discretion in the government and the agency that the statute doesn't seem to contemplate. I think, respectfully, Your Honor, the agency is really constrained by the statute because it has to identify all the mitigation measures it believes are sufficient in the regulations, and it did so here. No, but I'm talking as to the finding of total negligible impact. How can that finding logically be made if it's dependent on things that may come later? I think that process is set forth in the implementing regulations, which the League hasn't actually even challenged here. The plaintiffs have specifically stated in their reply brief that they are okay with this two-step process. That sets forth a letter of authorization process, and in the implementing regulations, I believe it's 18.27F4. The implementing regulations specifically state that the service may apply additional mitigation measures in the letters of authorization. So what the service did here is consistent with its implementing regulations, which interpreted the Marine Mammal Protection Act. And, again, the League hasn't challenged. So we don't give deference to the service's interpretation unless the language is ambiguous, and the language in the MMPA is not ambiguous as to that finding the Secretary must make. I think you're correct in that the statute does require the finding, and my response to that is that the service did make the finding here. And whether, you know, maybe another way of getting at this is to sort of look at what would be required in order for the service to make a negligible impact finding. And the negligible impact is defined in the implementing regulations as effects which are capable of being disregarded, essentially. And this Court has found in, I believe, the Chemthorne case, that for a negligible impact finding to be reasonable, what is required is the agency needs to look at the reasonably likely impact, the reasonably expected and reasonably likely impact, and determine that those reasonably likely impacts won't have an effect on the species. Nowhere in there is a discussion of how much detail in the mitigation measures is required, whether the agency has any discretion to adaptively manage for unforeseeable, not unforeseeable, but for new information as it develops in real time. For example, walrus haul-outs can develop in coastal areas, in different coastal areas at different times in any given year of the five-year period that the regulations are in existence. So a practical way for the service to manage and ensure impacts are negligible is to allow the agency to have discretion to adaptively manage for new information as it develops. For example, new locations of walrus haul-outs, new transit corridors as they develop. And it's really sort of a practical way of managing industry activities in the Chukchi Sea within this regulatory framework. Help me with some words here. When I looked at Section 1371 of the Marine Mammal Protection Act, subsection A5AI1, it doesn't use NEPA language, finding of no significant impact. Instead, it says, finds that the total of such taking during each five-year or less period will have a negligible impact on such species and will not have an unmitigable adverse impact on the availability of the species. Is that a significant verbal difference? And does it matter to this case? Probably not. What I was wondering was whether the letter of authorization was the mitigation, because since it refers to an unmitigable adverse impact, there's some implication that an adverse impact might be mitigable. I mean, I understand what you're saying. I think that that – Am I looking at the right reg? Oh, yeah, this is correct. I mean, I think it's correct that the statute does contemplate mitigation measures. I mean, there's – Statute, yes. That's what I meant. I was wondering if the letter was the mitigation measure. The letter of authorization is not the – well, let me just back up and say we haven't briefed what the service was considering when it adopted its implementing regulations, which set forth this two-step process. My initial sense would be that the agency would not consider the letter of authorization process to be a mitigation measure in and of itself, but it would be the vehicle to impose mitigation measures as they relate to particular proposed activities for any given time frame. So it's like – in another context, it would be like a forest plan, and then there would be specific timber sale that's being authorized by the letter of authorization, for example. The regulations are a general programmatic scheme, and then there's site-specific authorizations that occur through the letter of authorization process. But that two-part scheme, again, hasn't been challenged here. It's just whether – really what that issue is, was there enough detail in these regulations to support the services finding, and if you – Where in the regulations, the implementing regulation that we're dealing with here, where does the Secretary make the finding of no negligible impact in light of these mitigation measures that would be required in all letters of authorization? Is there an actual finding in these – I can't – Sure, yeah. Where? In the red, in section 18, is it 112? It's not – the finding isn't in the regulations – I don't believe the finding is in 118. The finding is in the Federal Register, and there – I believe the finding is at ER 78. Okay, so it's in the Federal Register in the notice part. Yes, before the agency issues the regulations. That's correct. And they make a finding that with these regulations – With these regulations and these mitigation measures in place that will be imposed in individual letters of authorizations, the total take will have a negligible impact on the walrus – On a small number. On a small number of walruses. Yes.  The negligible impact finding is separate from all that. It has to be nonlethal, incidental, unintentional take, right? Right, and the kinds of impacts we're talking about here are things like walruses moving away from vessels, and only one-third of walruses that were encountered in previous monitoring from 2006 to 2011 had any response at all. This isn't about killing walruses. It's about making noise that annoys them so they move to a different table in the restaurant. That's correct. Is that right? Yes, that's absolutely right. So councils argue it was mainly focused on the Hanna-Scholl area. That's right, and the problem with their argument is that it ignores all of the other mitigation measures that are required for all letters of authorization – Including in Hanna-Scholl. Including in Hanna-Scholl. So, for example, if there are thousands of walruses in the Hanna-Scholl, there is no way a vessel can move through it and keep a half mile away in the water. A vessel just can't go through there. And if it is in a different portion of the Hanna-Scholl and walruses suddenly come on the vessel, the vessel has to slow down, it can't separate the walruses, and it has to get out of the area to avoid impacting them. I would also just like to point the Court's attention briefly – there's a really helpful discussion of these impacts and the effectiveness of these measures, general measures, on page ER57 and 67 and 68 and 73 and 74. And that portion of the Federal Register goes through the studies that were done and the basis for the services determination that these kinds of activities really have no impact on walruses and even ice-breaking activities were found to have no impact on walruses when they're more than a half a mile away. When we say impact, what we mean is walruses moving away. Moving away, exactly. Kind of like changing tables in a restaurant if there's a crying baby. That's correct. And in some cases, some walruses even approach the vessels, and there was one instance where a walrus used a vessel to haul out on and rest on. So they're not always even moving away from the vessels, although most of the time they are. But these kinds of reactions are also within the walrus's normal range of behavior. Walrus's normal response to disturbance is to move away from the disturbance. And the pages that I gave you will also show that the expected duration of impact on walruses is expected to last no more than 30 minutes. So walruses will respond to a vessel for no more than 30 minutes, and they will move for no more than a half a mile. So these are very minor impacts. And the average time of a vessel and a walrus interaction was three minutes. So these are very minor, negligible kinds of impacts. And for that reason, the service was completely justified and reasonable in finding that any activity authorized in individual permits, so long as it was consistent, as those activities were consistent with what it had discussed in the regulation, there would be no negligible impacts. If the court has no further questions, I realize I'm extremely over my time. You are extremely over your time, and I don't think it really helps to ask you about this, but it just seems that there's so many places where the secretary in this part makes the finding that there will be no negligible impact, but then with respect to the Honosho area, it undermines that finding by saying, well, but in this area, there could be a high take. And so if the service determines that the proposed activity is likely to negatively impact more than small numbers, meaning you're not presently making a finding that there's a negligible impact because you're saying, well, later if we look at this and we see that there's more than a negligible impact, then we'll do something else. So it's undermining the strength of this finding, the credibility of the finding. I take your point. What I would say is if the service found that there would be more than a negligible impact, it would never authorize that individual authorization. So what, we're just supposed to trust the service? I mean, that doesn't make sense. I mean, Congress has mandated in order to protect the marine mammals in the world that you make the finding before you let the activity happen. Well, let me try a different approach. Well, I don't know. I mean, I know it's fine that the Secretary has these great ideals and good intentions about protecting the walruses. I'm just sort of stuck in what Congress has said. Sure, it has a sort of, and perhaps you might feel that this sort of has a trust us approach. We'll make sure it's correct later. Okay, and I don't know how many people right now really want to go along with the trust us approach for government. Well, let me assure you it's not a trust us approach. Well, don't tell me that. Let me tell you a couple, let me give you a basis of what some pages you can look at. So that you don't just have to trust me, you can look at the record. So on page ER-77, there's a description of the mitigation and adaptive management that would be required. On page ER-78, the service specifically said, our finding of negligible impact applies to incidental take associated with exploration and activities as mitigated through the regulations. So this, it made the negligible impact finding, and it said, as these activities are mitigated, there will be negligible impacts. On ER-69, the service said, these required, after discussing potential impacts in Hanna-Scholl, the service said these required monitoring and mitigation measures are designed to minimize interactions and are expected to limit the interactions and trigger real-time consultation if needed. Also, I would point out on page ER-84, in a response to comments specifically saying, hey, you might have, you should have maybe added more in Hanna-Scholl, the service said the separation distances, the separation restrictions required in the regulations are expected to minimize impacts in Hanna-Scholl. And I would also point out that for Hanna-Scholl specifically, the service didn't just say we might do more, we don't know what we're going to do. Are those two pages, 77, 78, 79, are going to tell me that? Yes. Okay. And I think you should let the interveners have a word or two. Thank you. Thank you. Thank you, Your Honors, for letting me have a few minutes. I'm just going to jump right in because I think this issue that we're getting at here is the most important issue in the case. And I think there's another angle on it, and it is that what the service did here was based upon more than two decades of implementing these regulations in the Chukchi Sea and in the Beaufort Sea. And over those two decades, they have developed a whole list of mitigation measures that fill up two to three pages in the regulations to explain how impacts to walruses will be mitigated, how impacts to polar bears will be mitigated. And when they were presented with this petition for the new ITR, incidental intake regulation in the Chukchi Sea, they looked at it and they said, okay, here's what's going to happen, and here's all of the mitigation measures we've required before. Here's all these additional mitigation measures we're going to require based on the best available science of what we know now. And they made a negligible impact finding. When the plaintiffs say that the negligible impact finding was dependent on later mitigation or that they didn't make it for everything, that's just incorrect. They did make a negligible impact finding. But they made it apparently in the Federal Register, not in the actual CFR regulation. That's what I was trying to understand. Because when I read the regulation, correct, that's in the CFR, 18, whatever it is, you can't find that finding of the Secretary, that if you adopt these, as counsel was just explaining to me, what you have to do is you have to go back to the Federal Register  and read the Federal Register in order to read the finding. Well, and that's all the statute requires. It doesn't require the finding of negligible impact to be in the regulations. But what the regulations do is they build upon the regulations. I thought you all said you can't do it unless you make a finding. That's correct. And then the finding was always in the Federal Register subsequently. I don't recall seeing findings in regs. Is that where they usually are? In the history of making these, I could be wrong, but I don't recall them ever having a negligible impact finding in the regulations themselves. They're in the Federal Register. And then what happens is they have their general implementing regulations. For the Fish and Wildlife Service, those are at 50 CFR 1827. And those general regulations require an LOA only to be issued if it's consistent with the negligible impact finding that was made. And those general regulations also allow for additional measures to be added on to an LOA. And then when they make their Federal Register notice, they build upon what's in 1827. They add additional regulations that specify, again, our finding is going to be consistent with our negligible impact finding. And the finding of no significant impact comes based upon the regulations. And then the government imposes additional restrictions beyond what the regulations imposed in its letter of authorization? They may do that. And I think what's important to recognize here is the negligible impact finding was not dependent upon later measures. So the regulation may say, stay a mile away from walruses on land and a half mile on sea. The finding of no significant impact may say, the walruses will not be significantly worried or disturbed so long as the vessels stay no closer than a mile when they're on land or a half mile on sea. And then the letter of authorization may say, just for safety's sake, we'd like you to stay at least two miles away if they're on land and a full mile on sea. That's correct, Your Honor. So there was a finding of no significant impact that if it was just a half mile and a mile, that would be good enough for no significant impact. That's correct. And what the service did here was based upon the science they had at the time. This is a five-year regulation. With a five-year regulation, there apparently has to be some flexibility, which is why the regulations at 18.27 allow for a consistency finding that allow for additional measures. And in fact, cited at footnote 19 in our brief, we cite numerous other incidental take regulations that all contain a phrase at the end that says, or additional measures as we deem appropriate, because the service does not know specifically where an LOA applicant is going to propose a project. They could have had projects all proposed that weren't anywhere near Hanashul. They could have had projects that were proposed near Hanashul at the wrong time. But they didn't know when the walruses would be there. They said if there were walruses there and if there was a project proposed there, then there might be a need to do something more specific based on the data that we have at that time. The Hanashul area seems to be a significant part of this area. Well, it seems like if the secretary was uncertain, I don't know why the secretary couldn't have promulgated in the regulations specific measures that would apply to the Hanashul area. Well, they listed what they knew based on the information they had. So they said, if something's going to happen, and again, their name is the one part kind of thing. Well, you started out by saying there's been two decades worth of experience with these regulations in the area out there, right? In the Hanashul area in particular. Well, not necessarily the Hanashul area. No prior attempts to drill in the Hanashul area or to explore? Not that I'm aware of. There's been no drilling in the Hanashul area. There's been in the Chukchi Sea. In the Chukchi Sea there has been exploration. We're talking about exploration. There's been exploration in the past. What has not been presented, what was presented with these regulations, which was that there are some lease blocks near the Hanashul under Lease Sale 193, which is still in litigation before this court. There is growing uncertainty because of what the government has seen in recent years with receding fees. I have a question about that. Does this case in any way depend on what happens with the underlying lease? I don't believe this case depends upon what happens with the underlying lease. There could be, for example, an operator or a seismic exploration company could go out and request a seismic survey and they wouldn't even have to have a lease block to do that. And they could ask for a permit or an LOA under these regulations to do that. Are you aware of any pending LOAs? I'm not aware of any pending LOAs. And you don't think this case is moot? The reason I... It's kind of funny because you're hearing the same thing from all the counsels. I know, it's very odd. So I guess industry's position on this is we've had two of these challenged now. And our position, and this is just industry's position, is that these challenges go more to stopping activities and making the process more burdensome as opposed to protecting marine mammals. And we've had two before this court, both of which were rejected. And frankly, we would like to have this court rule on this ITR because we think these are important and we think that the precedent that the industry and the government has established in this area is very important. Now, as to whether it's moot, they've challenged a five-year regulation. Somebody could... Not only has Shell said it's not going to drill, but the government's also said they're not going to issue any more LOAs. Well, that's actually not quite correct. The government hasn't said they're not going to issue any more LOAs. Somebody could, for example, apply tomorrow for an LOA to do a seismic exploration survey anywhere in the Chukchi Sea, not even near Hanushul, and the government could grant that. And so that's why I think this is not moot, is somebody could apply for an LOA and be granted it and go out and do a seismic... I'm not even talking about drilling, just seismic exploration. And somebody could go do that. And these regs cover that activity. Regs would cover that activity. And, you know, I think the plaintiff's case is all about Shell. Otherwise they would have filed this case when this regulation first came out. They would have challenged the three LOAs, all of which had Hanushul mitigation measures in them. They didn't challenge those. They didn't challenge the regulation when it came out. So it is about Shell, but they're challenging the regulation itself, and technically I don't believe it's moot because somebody could apply under the regulation. And the preliminary injunction papers were all about Shell too. They were all about... I mean, practically it's all about Shell, but technically because they're challenging the regulation, I don't think it's moot for that reason because somebody could get an approval under it. But nobody proposes to, is that right? Pardon? Nobody proposes to at this time. Nobody proposes to at this time. And, you know... No particular reason to think anybody will. Is that right? I personally don't have any... I don't have any information that anybody is going to submit an LOA. You would sort of like to get... It looks like everybody would like to get an advisory opinion on whether this procedure will stand up if and when there is ever any interest again in oil exploration in this region. I think that is the position of the parties. And the last point I'd like to make is what the government said, is the two-tiered structure is very important. Again, what wasn't dependent was the negligible impact finding. That was not dependent. What they were saying is in order to make our consistency finding, which is required at the LOA stage, based on whatever was ever proposed in the application, we might have to reject the application or we might have to say we want some other specific measures. The problem for me on the substance of this is that it's a hollow finding if you're going to also include language that... But as to this portion of it, we can't really make that finding. So we're proposing all these follow-on procedures. And that's really the problem for me on this. Well, but they did make the finding. They didn't say we can't make the finding. No, they made it, but then they said, as to this specific place, we can't make it. Well, they didn't say that either, though. They said we were making it for the whole area. Judge Wardlaw and I are obviously having different understandings here, and I may be mixed up here because I'm really having trouble with this. Let me draw a real simple analogy to make what may be my confusion curable. Suppose you have a law that says you can't hunt bears with BB guns, and then you have a finding that it will have no significant impact on the bears if people hunt them with BB guns. And then you have an agency that says, we want to protect the bears even more, so we're going to impose an additional rule that you can't hunt bears with potato guns. That's how I understand the government and the Oil and Gas Association to be arguing. You have a good finding of no significant impact just on the regs that say an airplane has to be more than 1,000 feet above the ground and a boat has to be more than a mile from the bear and so forth, and then you have additional restraints in the letter of authorization that say not only that, but we're going to not even near the walruses with potato guns, even more restrictive than was necessary for the finding of no significant impact. Now, an alternative understanding of your side's argument in this case and the government side's argument is that, no, no, no, what they're saying is there'll be a finding of no significant impact, but only if the terms of the letter of authorization are complied with, as well as the terms of the reg. So, yeah, there might well be a significant impact on the bears if people hunted them with BB guns, but there wouldn't be if we prevented them from hunting with BB guns or potato guns. Which is it? Well, I think it's the first that you described, Your Honor. It's that the reservation to impose additional measures is there to be more protective if that's necessary. The government didn't say, we will have to impose additional mitigation measures at Hannah Shoal. They said, we may, but we don't know because we don't have the specific information. They're saying it's the first one. We may impose additional measures, but there'll be no significant impact even if we don't. They said, based on the information that we have at the time, we believe there is no significant impact. There is a negligible impact. There is a negligible impact. We believe there's a negligible impact in small numbers. Plaintiffs haven't disputed the small numbers finding. And at that point, they say, we think there's a negligible impact. Now, we recognize the government was being open. We recognize that there is the Hannah Shoal area, and that based on what applications come in and based on what people propose and based on what walruses might be in their condition three years from now, we might have to tailor these to add some more specific measures. But at this time, we have no applications in front of us. We don't know what the science is saying three years from now, and so we can't tailor those. But they're reserving the ability to tailor them if necessary, but they didn't say that was absolutely going to be required. If they have no applications in front of them, why would they even issue this regulation? Well, that's a good question. The petition is the industry saying the industry is petitioning. When they're petitioning, they're saying our members are going to submit LOAs. And that's why we want to have this regulation in place. And so that's kind of the petition is saying we're going to have LOAs down the road. I didn't realize that your petition proposed that there actually were going to be any applications to do anything in this area. There could be, and you'd like an advisory opinion to get more certainty in the law. Well, the petition says that we anticipate, it's kind of hard to project fibers out, but we anticipate that there's going to be this many seismic surveys. There might be this many exploration drilling operations. There might be this many geophysical surveys. Is anything on the table? I thought it was more we hope there will be. We are, after all, the Alaska Oil and Gas Association, but nobody's got anything proposed. Well, I wish there was more proposed. Their petition says this is what we are anticipating is going to happen. And we're anticipating people are going to request LOAs. Where do I look for that? It affects me. It describes it in the Incidental Take Regulation, the Federal Register Notice, and it also describes it in the record. What I'm looking for is where your association says there are going to be more applications. Where there's going to be more applications. See, I thought this was moot because everybody's pulling out of the Chuck G.C. between the low price of oil and the high and uncertain burden of regulation. They figure it's just not worth the money, and it's over. And you're saying, no, no, no, it's not. Our petition says there are going to be more applications, so I want to know where to look. Well, the situation now is different than when the petition was submitted. The price of oil is cut in half. It's worse for the oil and gas industry. So I don't think you can look to their petition to say there's for sure going to be more LOAs. For all I know, there won't be any more LOAs. Is there anything that says that there will be from somebody who would know that there will be? I'm not aware of anything that would say there is going to be another LOA request for this incidental take regulation. There could be. It looks like we're regulating buggy whips here. Okay, counsel, thank you. I think you should sit down. We've been going through, I mean, Judge Klinefeld's right. We're both confused in how we're looking at this, and I think after an hour and a half of argument we're getting more confused, so maybe we'll just give you a couple more minutes to sum up in response to Judge Klinefeld's last question, like how we're looking at it in opposite mirrors. And I would just encourage the Court to read the implementing regulations, which require them to deny or suspend. They can't allow an activity to go forward that has a negligible impact. Thank you, Your Honor. I appreciate it. Your Honor, the government concluded that the general mitigation measures set forth in the regulation may not suffice to ensure negligible impacts, as Hannah Schultz said. Where can we read that? At Excerpt of Record 46, where they say additional mitigation measures may be required to ensure consistency with the MMPA mandates of negligible impact. That's at 46 and at 132 repeated. And then at 84, they say we will consider whether additional mitigation and monitoring measures could reduce any potential impact to meet the small numbers and negligible impact standards, and we'll do this at the lower stage. So they didn't even know whether the additional mitigation measures would suffice. That's at 84 and at 79. And 79, I will point out, is right in the negligible impact finding section. So that's when they are describing, as the government counsel said, at 77 and 78, the general mitigation measures, and then they have on the next page, 79, a section that says, well, we're going to impose additional potentially in the Hannah Schultz and we will consider whether these additional could reduce. And the agency goes even further in the EA, where it says that industrial activities that occur near coastal haul-outs near the Hannah Schultz Walrus use area or intersect travel corridors will need close monitoring and special mitigation procedures. That's at 173. So it is absolutely clear from the record that the agency concluded that the general measures and past practices might not suffice for the Hannah Schultz, and that's why they couldn't reach the negligible impact finding. This is clear also in the... that the agency has said that's not enough to avoid a significant impact on the Walrus, a significant take on the Walrus. It may not be enough to avoid negligible impact on the Walrus. The government itself concluded that. We'd like to mitigate even more. That's absolutely right. And they reserved to them the right to mitigate further in the LOAs. That's right. There's not a problem to mitigate further in the LOAs. We don't challenge that general implementing regulation, but the agency has to make a finding up front that if it's relying on additional mitigation measures for reaching its negligible impact finding, it needs to explain what those additional measures are. It has to make that finding up front. Also, as to Judge Wardlaw's question, it also... the statute also requires that the agency set forth up front the means to affect the least practicable adverse impact. That is also an up front requirement in the law. And PASS is not... so there are these clear findings in the record that indicate that the general measures... the government's own expert conclusion was general measures may not suffice for the Hannah Shoal. And the analysis leading up to the Federal Register also puts that in context because what the agency has determined was that there was, quote, a new pattern of water distribution and movement due to, quote, unprecedented environmental changes as a result of climate change. So this was new. And that's at 154 and 167. And its own scientists... so when it proposed the rule, the government sort of recognized the problem and recognized... I'll just point you to... sorry, I'll just point you to one more thing in the record that helps contextualize the finding, which is the statement that we can reliably predict that many walruses will likely remain even after ice melts for foraging purposes in the Hannah Shoal. That's at 69. So that's the certainty about the problem. And so it identified this problem. And in the proposed rule, the agency said that it would likely preclude oil and gas activities in the Hannah Shoal. That's at 184. But industry wanted access in its comments at 198 and 200. And so after the climate period closed, the record shows the agency's own wildlife biologists discussing, you know, struggling with how to mitigate, how to allow activities in the Hannah Shoal, how to have a rule that covers the Hannah Shoal but still reach, still comply with the MMPA mandate. So the scientists recognized that additional mitigation, quote, above and beyond those in the rule would be required for activities in the Hannah Shoal. That's at Excerpt of Record 201. But they couldn't identify the measures that would allow activities there and still meet statutory standards short of precluding activities altogether from the area. That's at 204. But the rule doesn't preclude activities there. It covers the area. And it says, look, we've identified so we'll figure it out later at the letter of authorization stage. We'll figure out whether there are additional measures that can reduce impacts to negligible. And that's not allowed under the MMPA. All right. Thank you, Council. Thank you. I thank everybody for a really excellent argument. And I will probably be spinning this further. So this case will be submitted. Alaska Wilderness v. Jewel is submitted. And this session of this court is adjourned for today.
judges: Kleinfeld, Wardlaw, Paez